CHANCERY.   *Blight's heirs &c. vs. Tobin &c.; same. vs. same, and Tobin vs. Blight's heirs &c..*

Case 131.    Writs of error to the Hardin Circuit; PAUL I. BOOKER, Judge.

Sheriffs' sales.   Jurisdiction.   Limitation.   Evidence.
Fraud.   Partners.   Practice.

November 28.   Judge MILLS delivered the opinion of the court.

Blight's land in Hardin, Grayson and Hart counties.

SAMUEL BLIGHT, a citizen of Penn-- sylvania, held claims to a considerable quantity of lands in this state, situated principally in the county of Hardin, but extending largely into the counties of Hart and Grayson; and he came to this state and took up a temporary residence in Hardin county, and boarded with his family at a public inn in Elizabethtown, for the avowed purpose of investigating his land claims and settling his business here.

Agreement between Blight and Tobin.

On the 17th of March, 1820, he constituted Benjamin Tobin, a practising lawyer, resident of Hardin county, his agent, by letter of attorney, authorizing Tobin to lease his lands, to receive and recover rents, by law or otherwise, and delivered to him sundry notes, leases &c. evidences of rent due. Tobin was to receive one third collected, for his services. Tobin also acted as attorney at law for Blight in sundry suits, chiefly, if not entirely, for rents due, in some of which he was successful, and in others not.

Judgment against Blight, and sheriff's sale to Tobin of the land claimed by Blight in Grayson.

Tobin also brought against Blight, as attorney and counsellor at law, an action of debt, by petition, in in favor of David Simpson, and recovered a judgment therein against Blight, for $93 50, with interest from the 4th September, 1822, till paid, and about $7 16, costs. This judgment was obtained at the March term, 1823, in the Hardin circuit court, where both Blight and Tobin then resided. On the 25th of March, 1823, Tobin caused the first execution to issue on this judgment, directed to the sheriff of Grayson, an adjoining county, endorsed that notes of the Bank of the Commonwealth would be received in payment, that kind of paper being then at a depreciation of about two dollars for one. This execution Tobin carried to the sheriff, and caused.

him to levy it on all the lands of Blight extending into Grayson county, which was not measured, but bounded by the county lines and the lines of the original surveys, and containing some uncertain quantity, of from eight to twelve thousand acres, all of which in the lump, was sold by the sheriff, and Tobin became the purchaser, at the price of about $30 in said bank paper; and he received the conveyance of the sheriff for the whole. This execution was not returned till the 31st of July, 1823.

BLIGHT'S hs. &c.
vs.
TOBIN &c.

On the 21st of June preceding, and upwards of a month before the first execution was returned, Tobin issued a second execution, directed to the sheriff of Hart county, which he caused to be levied on the lands of Blight extending into that county also, amounting to ten thousand acres or upwards; and the whole thereof bounded by the county lines and the original lines of the surveys, without measurement, was sold under the direction of Tobin, and George T. Wood became the purchaser, and received the sheriff's deed thereto, for the joint benefit of himself, Tobin, and a certain Thomas Johnson, at the price of $55 12 cents, in paper of the Bank of the Commonwealth.

*Sheriff's sale of the land claimed by Blight in Hart, purchased by Wood for himself, Tobin and Johnson.*

Tobin also, as attorney or counsellor at law, obtained another judgment against Blight, in favor of Southard and Starr, the amount of which was replevied by Blight; and on the 10th of December, 1823, an execution was issued on the replevin bond, against Blight and his sureties, for the sum of $87 84 cents debt, with interest and costs, directed to the sheriff of Hardin county; and Blight, to save his sureties, in writing, surrendered 1000 acres of land to the sheriff, who levied thereon, as well as on some personal estate, there being one other execution levied at the same time; and the 1000 acres of land was sold, and Tobin became the purchaser, at the price of $51 in paper of the Bank of the Commonwealth, and received the conveyance from the sheriff.

*Sale by the sheriff of the land claimed in Hardin to Tobin.*

To set aside these sales and conveyances, Blight brought the two suits in equity now under consideration.

*Blight's suits to set aside the sheriff's sales.*

Blight's hs.
&c.
vs.
Tobin &c.

In the one he included the first and the last of the afore recited sales, making Tobin a defendant, and those who purchased from him.

In the second suit he embraced the second sale only, and made Tobin, Woods, and Johnson defendants.

Grounds alleged by Blight for vacating the sales.

All these sales are attacked upon the ground that they were secret, carried on with address, and fraudulent, and illegal; and also on the ground that Tobin was his agent to protect and preserve those very lands; that he had received more money of his than was sufficient to pay the executions, and held it then in his hands, and ought to have paid the executions, and therefore he made the payments under circumstances that constituted Tobin his trustee, and that he ought to surrender the title acquired by the most enormous sacrifices, and at unconscientious prices.

Answers of the defendants.

Tobin, as well as the other defendants, contest all these grounds, and insist upon the title as their own.

Decree of the circuit court for Blight as to the land in Grayson, and for Tobin as to that in Hardin; and writs of error by each party.

On hearing, the court below set aside the first sale, made in Grayson county, and decreed a release thereof, and refused to set aside the sale of the 1000 acres made in Hardin; and this composed the decree in the first named case, to reverse which both Blight (or his heirs since his death) and Tobin prosecute their respective writs of error; the first complaining that the court did not set aside both sales, and the latter that either was set aside.

Second bill for the land in Hardin dismissed, and writ of error by Blight's heirs.

In the second suit the court refused to set aside the sale to Wood, Tobin and Johnson, in Hart, and dismissed the bill; and to reverse that decree, Blight's representatives have prosecuted their writ of error.

Cases considered together.

We have considered these three writs of error together, as they depend on similar principles, although the circumstances of each sale are somewhat different.

A previous question or two, applicable to each case, is made. It is insisted that the chancellor has no jurisdiction of this matter, and that it belongs to a court of law, and that the motion to set aside the sale not having been made in the court of law within one year, no remedy exists to annul the sale.

We cannot concede that sales of land by *fieri facias* constitute a mode of alienation over which courts of equity have no control. We cannot expect to find precedents for such an exercise of jurisdiction in the English chancery or in Virginia; because, that in these countries sales by *fieri facias* were rare or altogether unknown. But in the states which have introduced sales in satisfaction of debts by *fieri facias*, courts of equity have made them a subject of its revision, as is manifest by the cases of Woods vs. Morvell, 1 John. Chy. Rep. 502; Tiernan vs. Wood, 6 John. Chy. Rep. 411; Troup vs. Wood &c. 4 John. Chy. Rep. 228; Howell vs. Baker, ibid. 118; Gist vs. Frazer & Stewart, 2 Litt. Rep. 118. Analogous is the case of Strael's ex'ors vs. Couns, 4 Cranch, 403.

*Blight's hs. &c. vs. Tobin &c.*

Equity has jurisdiction to set aside sheriff's sales of land under executions of *fieri facias*.

We do not mean that a chancellor, in exercising this jurisdiction, will act as a revising court over the records of a court of law in executing their process, or make further use of errors at law than to prove or disprove the fairness or unfairness of the sale. He will treat all the proceedings at law as valid, although error may appear therein, and will relieve against the consequences thereof, because the rights acquired thereby cannot be retained in conscience; and in doing so, he will treat the purchaser as a trustee of the estate, and will not compel him to surrender it till equity is done to him.

In bills in equity to set aside sheriff's sale of land, the chancellor will not consider legal objections except as evidences of unfairness.

In this respect the proceeding is more favorable to the purchaser, than in a court of law. His title is treated as legally valid, and his money is generally restored before he will be compelled to surrender it.

It is true a court of law will correct the abuses of its process, and that where fraud exists. But as to sales of this kind, the motion for fraud is limited by statute to one year; but the omission to pursue this remedy in the year, is rather a reason for the interference of the chancellor than against it. For the limitation is not on the powers of the chancellor, but on those of a court of law, and the omission to pursue one remedy does not preclude a resort to the other, provided the case is otherwise proper for a court of equity.

In such cases the complainant generally will be required to restore the purchase money.

Bills for relief against the sheriff's sales of land are not, like motions, limited to one year.

BLIGHT's hs.          On the merits of these sales, a further preliminary
&c.              observation is necessary.  The person who was the
vs.              legal purchaser at two of these sales,  and a  partner
TOBIN &c.        in another, was the counsel for the plaintiff in both
_____          the executions, which were used.
Query. Is the
fact of the at-
torney for the       It has been held, or at least said, by some chancel-
plaintiff in     lors, that a purchase by counsel in such circumstan-
the execution    ces, ought not to be permitted to stand.  The cases
becoming the
purchaser of     on this point are referred to by chancellor Kent, in
the land at      the afore cited case of Howell vs. Baker,  in which
the sheriff's    he descants with considerable severity on such pur-
sale, a fatal    chases,  and shews that authorities are not wanting
objection to
the sale.        to prove, that the purchasing attorney,  in all such
                 cases, must become a trustee for the original holder;
                 and that redemption must be allowed.   The reason
                 of such a rule appears to be the same which forbids
                 a sheriff to become a purchaser, by statute; or an ex-
                 ecutor or trustee to become a purchaser of articles of
                 which he is the seller.   The attorney for the plain-
                 tiff in an execution, is supposed to have such a con-
                 trol  over the sale as to  come within the reason ap-
                 plicable to  the actual seller, and therefore ought  to
                 allow a redemption.

                     But without approving or disapproving these au-
If not, yet      thorities, and  not wishing  it to be understood that
it is a cir-     we go the whole length of this doctrine, all the use
cumstance to
induce the       we shall make of it is, to shew that the  chancellor,
court to scru-   if he does not carry out this doctrine, will scrutinize
tinize the pur-  a purchase thus made by counsel, with greater strict-
chase with
the greater      ness than he would a purchase by one who had no
strictness.      control over the execution; and if there be circum-
                 stances or grounds to make such a purchaser a  trus-
                 tee, it will be done,  securing to him all the money
                 which he may have paid.

                     One circumstance attending all these sales,  is cal-
Great inade-     culated to lay them under a weight of suspicion not
quacy of the     easily removed, and the conscience of the chancellor
price is a hea-  will  revolt at permitting them to stand as they are.
vy considera-    The price is so small,  compared  with  the value of
tion against a
sheriff's sale.  the land, and the sacrifice is so great, that  it shocks
                 the moral sense.   The land in Grayson is proved to
                 be worth something like $5000 or $6000 specie, and
                 it is purchased for about $15.   The land in Hart is

of about the same value, by the proof, and it is purchased for about $26. The 1000 acres in Hardin is shewn to be worth at least $5000, and it is bought for $25 or $26, specie. The inadequacy of consideration, *per se*, may not be sufficient to overturn the sale; but it is a circumstance that weighs heavy, and requires but little addition from other circumstances to authorize the inference of fraud. Of the two sales made under the execution of Simpson, of the lands in Hart and Grayson, but little need be said. These sales must be overhauled.

*Blight's hs &c vs. Tobin &c.*

Besides the great disproportion of price, there was evidently some degree of both haste and address used in transmitting the execution out of the county, and out of sight of the defendant Blight, to counties where he could not suppose they were gone, not for the purpose of making the money, because there was every reason to suppose the money could be made easier, in the county where Blight was, but with the intention of making a speculation out of his estate, and there the whole unmeasured and undefined quantity was set up and sold as a packed lot at auction, where the purchaser is afterwards left to examine and count what he has got. These with other circumstances, forbid that either of these sales should stand, and the court below erred in refusing to direct a restoration of the title to that land sold in Hart and bought by Wood.

*Fact of the attorney of the plaintiff having sent the execution to another county, and speedily effected the sale, without defendant's knowledge, evidence of fraud.*

There is one circumstance proved touching that sale more strong than any belonging to the sale in Grayson. A person made known, before the day of sale, his intention to attend, and become a bidder. This was told by him to the counsel for the plaintiff in the execution, of whom he enquired the day of sale. He was flattered in reply with a partnership in the purchase, and told of the day of sale, when he might attend. He attended on the day pointed out, and the sale was over the day before, and he was laughed at because he came a day after the fair.

*Purchaser having purposely misinformed a person, intending to attend and purchase, of the day of sale, evidence of fraud.*

The only plausible reason on which we can suppose the court relied in sustaining this sale in Hart, whilst it set aside the sale in Grayson county, is, that the purchase was legally made by Wood,

*Acts of one partner in the purchase, to effect a fraudulent pur-*

BLIGHT's hs &c vs. TOBIN &c.

_____

chase at a sheriff's sale, imputed to all.

who, with his partner Johnson, are not proved to have been participating in, or privy to the imprope.: management of the execution. But it is admitted by all three, that Tobin, is, and was at the sale, a joint partner in the purchase when made, and we cannot sustain the principle, *that one or more partners are to be saved in a speculation,* when *one of the* parties most active in procuring it, had acted improperly, merely because he or they were ignorant of the impropriety. Each partner must be bound by the act of one, managing the matter in hand, and his title must stand or fall accordingly. The law will account them one person, and the improper acts of one must be the act of all.

Case of the land in Grayson.

In the sale which the court did set aside, there is error in the details of the decree, which we feel ourselves bound to notice.

Situation of the sub-purchasers without.notice.

After Tobin had received the sheriff's deed for the land in Grayson, he sold and conveyed part of the land to sundry persons, who are made defenants. These persons seem to have become purchasers of the title from Tobin, in the following way. They had previously purchased the land from some other persons, under what claim or title is not *explained* in this record. But their vendor, or his representatives, willing to secure them in their first purchase, bought in *this title of Blight from Tobin,* and paid him therefor $500 in paper of the Bank of Commonwealth, and Tobin by his, or their, direction, conveyed the title to these defendants, and each of them answer and deny all knowledge of fraud or improper practice in conducting the sale, and there is not the least proof that they had any notice or knowledge on this subject, except what the deed of the sheriff to Tobin conveys, which is fair on its face and gives no intimation of any impropriety, except what the small price intimated, and this we have seen of itself does not establish fraud.

Decree against the sub-purchasers of Tobin for a special re-conveyance.

The court decreed against these defendants that they should relinquish, or convey back, their title to the complainant by deed with special warranty against themselves, and all claiming under them, "but not disturbing any prior or other title, the said

defendants may have had to said land, before the said sale, and purchase from the sheriff, but leaving the same as it then and before stood, unaffected by this decree."

Now how these defendants could convey with warranty against themselves, and those claiming under them, and yet be allowed to retain other claims to the land, is to us an inconsistency not reconcilable on the face of the decree. Moreover, how these defendants could convey a title from themselves, and yet retain a title in themselves, is a problem which is not easily solved; for we are not acquainted with the process of severing or splitting asunder titles after they are united in the same person; but conceive the law to be that if a purchaser holding one title honestly, acquires another dishonestly, so that he must surrender the latter to its true owner, his former title goes along with it.

And the only way that he could excuse himself from such a consequence, would be to set up his first title, and shew its validity and superiority, and of course that he acquired nothing by the last title, which he ought to surrender back. If therefore, these purchasers from Tobin, ought to convey, they could not retain previous titles to the land, as they have not set up and shewn their superiority.

But we do not see the propriety of any decree against these defendants. So far as appears, they are innocent purchasers without notice of any impropriety in the sale. The bill ought therefore, as against these defendants, to have been dismissed with costs.

But as Tobin held this title when he ought not, and has sold it to those innocent purchasers, by which Blight or his representatives have lost it, it follows clearly that he must account to Blight's estate for the value of *the land so conveyed away by him, to be fixed at the time of assessment, and this is the decree which ought to be rendered as to this portion of the land, he conveying back the title to the residue.

' As to the last sale in the county of Hardin, of 1000

---

**[Margin notes]**

BRIGHT's hs &c vs. TOBIN &c.

One who holds the valid title, and afterwards acquires a bad one, cannot convey or release the latter without the other; both will be passed by any instrument which conveys one.

Where a person having one title afterwards acquires another by fraud, he can resist a general conveyance only by shewing his first title the superior.

Vendee without notice of a fraudulent purchase at sheriff's sale, not affected by the fraudulent purchaser. But the purchaser under the execution must account for the proceeds of *his* sale to the former owner.

BLIGHT'S hs
&c
vs.
TOBIN &c.

Facts in relation to the sale of the land in Hardin.

acres given up by Blight, it is a question of more difficulty, and is a case nicely balanced between an enormous and unconscientious speculation, on one hand, and the imprudent conduct of Blight, and the stern law of the case on the other. This was sold under the execution of Southard and Starr. The sheriff had this execution, which did not amount to $100 in bank paper, and also another of a larger sum, perhaps about $500 in favor of Southard alone, against Blight, at the same time, and both these executions were on replevin bonds, and endorsed that bank paper would be taken. The sheriff levied them both on two horses, belonging to Blight, and Blight also to save his securities in the replevin bond, gave up to the sheriff, by writing describing the land, this 1000 acres now in dispute, on which he had a tenant residing at the time. The sheriff under both these executions advertised the two horses for sale on the 14th Febuary 1824, in Elizabethtown, and the land on the premises on the 15th of the same month, adding to the advertisement, that the land would be sold "provided the personal property first named, (to wit, the horses) and described, shall fail to satisfy the same." Before either day of sale, the larger execution was taken out the way by an injunction. Why the horses were not sold on the 14th of the month, to satisfy the smaller execution of Southard and Starr, is not explained in the record. The day for the sale of the land however came, and the parties were all in Elizabethtown, and Blight seems to have been struggling to make some arrangement to save his land. A Mr. Bland was indebted to him, and to Bland, he applied for the money. Bland applied to a Mrs. Vanmetre, who was in *his* debt for the money. She had more than the necessary sum in paper of the Bank of the Commonwealth, which she offered to furnish to Bland, provided Bland would give her credit at the rate of two dollars on her bond for three dollars in bank paper. This was greater than the usual rate of exchange. Bland was unwilling to give this, unless Blight was willing to make this allowance, to which Blight disagreed, and thus part of the day was spent in chaffering about this money, and

the sheriff urging Blight to get the money, or he would go and sell the land, and reminding Blight at the same time, that the proper time of the day for the sale of the land by law, would be over by the delay. Blight assured him that the money would be had, and asserted that he would take no advantage of the time of day, if the day passed away and the land must be sold. The sheriff vexed, at length determined he would go and sell the land, and gave notice to Tobin, the counsel for plaintiffs, that he was starting for the purpose, and Tobin started with the sheriff. Blight and Bland both started after them, and overtook them before they got to the ground, about seven miles from town. On the way, Blight, in an ill humor, reminded Tobin that he was acting as his enemy, when he professed to be his friend, and was his agent and counsel, and told him that he must discharge him from his service, as he wanted no such friends, or words to that import. When they arrived on the ground, the time of day fixed by law for selling the land was passed, and the number on the ground seems to have been the sheriff, Blight, Bland, Tobin, and the tenant of Blight, at whose house the sale was. Blight there tendered the horse which he rode, which was one of the same horses advertized as personalty before spoken of, to be sold in lieu of the land. The sheriff took the horse and began to cry him, and stated he could get no bid. The tenant of Blight then offered to bid, and Tobin then interfered and told the sheriff that he would render himself liable if he sold the horse, and the sheriff then gave back the horse to Blight, and set up the land for sale. Bland soon bid the debt for half the land, and when the land was struck off to him, told the sheriff that he had not the money with him, but the money was in town, and he would pay it as soon as they returned. The sheriff refused to go to town, but required the money on the spot, which neither Bland nor Blight, for whom Bland had bid off the land, had with them. The sheriff accordingly set up the land again, and refused to cry the bids of Bland; and Tobin, without competition bid off the land for $51 in bank paper. After the parties returned to town, Bland and Blight

BLIGHT's hs
&c
vs.
TOBIN &c.

Equity may
interpose and
permit a re-
demption of
land sold un-
der execu
tion, on the
ground of the
conduct of
the sheriff
and purchas-
er, where a
court of law
would not
set aside the
sale.

Chancellors
have ordered
re-sales of
property sold
under execu-
tion at enor-
mous sacrific-
es.

Purchasers
not affected
by irregulari-
ties of the of-
ficer, but the
officers are
liable to the
party injured

But where
the purchaser
is the con-
ductor of the
sale, and
knows of the
irregularities,
the chancel-
lor may com-
pel him to
surrender the
title on re-
ceiving his
money back.

offered to the sheriff the amount of the execution and he refused to receive it.

We have come to the conclusion that the purchaser in this case ought to be construed into a trustee for the complainant, although there is some difficulty in saying that the purchase was against law; and we will add that there may be cases where the chancellor will interpose and permit a redemption of estates sold under execution, even when a court of law would refuse to set aside the sale as a fraudulent violation of law, because the chancellor may do complete justice by restoring the money paid, which a court of law cannot do, and from the relation of the parties, equity may presume a trust which sometimes may become necessary to avoid an odious speculation on the distresses of the debtor.

Indeed cases are not wanting where a party plaintiff has bought in property at an enormous sacrifice, under execution, and the chancellor has directed it to be set up again at the price at which it was bought, and for as much more as would be bid, still preserving the interest of the purchaser by securing his money.

It is a settled rule that a purchaser is not bound, nor is his purchase affected by the irregularities of the sheriff in advertising and conducting a sale, and if injury results, the party must take his remedy against the sheriff. Hence courts of law but seldom set aside titles thus fairly acquired by an innocent purchaser acting under the confidence which ought to be reposed in the organs of the law.

But whether there might not be cases of that kind, where the chancellor would construe such a title into a trust, we need not now enquire. Suffice it to say, that in a case where the conductor and director of a sale, as Tobin was in this instance, knows of the irregularities of the officer, and that those irregularities had brought this land into market under circumstances which demanded so heavy a sacrifice, he ought to be compelled to surrender his title on receiving his money.

If the sheriff had proceeded with the sale of the

personal estate at the proper hour, there could have been no necessity of selling this land. The circumstance of omitting to sell the personalty, and then insisting on the sale of lands of $5000 in value, to satisfy an execution, not amounting to $100, at an hour when the attorney who only could, and did direct the sale, could purchase it at, not much more than $25 in specie, and that without competition raises too violent a presumption of combination between the two, to permit this sale to carry the title forever.

This conclusion is not a little strengthened by the circumstance of the attorney deterring the sheriff from selling the horse, in order that the land might be sold. The fact was, the execution was laid upon the horse, and the authority of the sheriff to sell him was complete, and all that stood in the way of his sale then, before the land, (as was the rightful course) was that the then time and place was not advertised. This, however, was waived by Blight. But the attorney by his advice, defeated the sale of the horse, and thus reached the land.

It is also proper here to take notice of the accounts of the parties brought into view by the pleadings. Blight insists that Tobin has received more of his money than is sufficient to pay the price of this land, and has adduced proof of his receiving money to some amount. Tobin admits the receipt of some money, but alleges that Blight owed him for fees, and has proved that he acted as counsel for Blight, so as to be entitled to fees to a greater value than what he has received; also that he has made some disbursements for Blight. If these services were rendered as counsel for Blight, in the recovery of rents only, then Tobin, by the contract proved, is entitled to one third only. If the services were rendered in other cases, then he is entitled to reasonable fees. As Blight, therefore, or his representatives, must restore the purchase money, paid for the land, scaled to its specie standard, so an account must be taken of the money of Blight, collected by Tobin, allowing him one third thereof, for his services as counsel, as far as rent is concerned,

*[margin:]* Blight's hs &c vs. Tobin &c.

Irregularities by the officer in the sale.

Controller of the execution having prevented the sheriff from first selling the personal property surrendered by defendant to be sold, without notice, and then purchased the land himself, compelled to submit to redemption.

Accounts between Blight and Tobin to be settled.

BLIGHT's hs and reasonable fees for other services; and Blight
&c         must also be charged with the price of the land,
vs.        and if the balance be in favor of Tobin, the court
TOBIN &c.  below must see to the payment thereof, before giving
           a decree for the title.

Decree in the   This account must be taken in the case, wherein
case of the  Blight was plaintiff, and Tobin, Morrison Dewit,
land in      Wooldridge and others, are defendants; in which
Grayson.     Tobin, on the restoration of his money, must be de-
             creed to release, and convey the 1000 acres, and al-
             so all that part of Blight's land lying in Grayson,
             which he has not sold and conveyed to Wooldridge
             and others, and the bill must be dismissed as to
             Wooldridge &c. grantees of Tobin, and an assess-
             ment of the value of the land conveyed to them res-
             pectively by Tobin, must be made by commission-
             ers, and Tobin must be decreed to pay the amount
             thereof to Blight's representatives.  Morrison and
             Dewit, who are mortgagees of the 1000 acres, and
             who profess their readiness to release it, must be de-
             creed to reconvey without costs.

Decree in the   In the case where Blight is complainant, and To-
case of the  bin, Woods and Johnson, are defendants the de-
land in Hart.  fendants, on receiving the price paid by them, assess-
             ed in specie with its interest, must be decreed to re-
             convey all the lands lying in Hart county, with
             costs.

Decree in the   The decree in the writ of error, Blight's repre-
case of the  sentatives vs. Tobin, Wooldridge &c. must be re-
land in Har-  versed with costs, against all the defendants, except
din.         Morrison and Dewit, and the cause be remanded for
             proceedings, not inconsistent herewith.

Mandate in      In the case of Blight vs. Tobin, Wood and John-
the Hart case  son, the decree must be reversed with costs, and the
             cause be remanded for new proceedings, not incon-
             sistent herewith.

Costs.          Tobin must pay the costs of the writs of error
             prosecuted by him, in the suit, Blight vs. Tobin,
             Wooldridge and others, as he has failed to prose-
             cute it with effect.

*Petition for a Rehearing,* by BEN. HARDIN.

THE undersigned who argued these causes in the court below for Tobin, has this morning for the first time learned, that this court had given an opinion, which he has in part examined, and has, in equal haste, drawn this petition for a rehearing, as he understands the court is to adjourn in a few minutes. As to the one thousand acres, the court has construed Tobin into the character of a trustee in his purchase. Upon what principle they have done it, I am at a loss to conjecture. Was he Blight's agent in the sale of that land? I answer, no. He was the attorney on the other side; and before the sale Blight dismissed him from all other agencies.

Had he any money of Blight's in his hands? I answer, not one cent. The doctrine about a counsel being construed into a trustee, cannot be sustained; but if it could, it is a trustee for the person who employed him, and not the adversary of his client. There are but two trusts resulting by operation of equity known to the books, since the statute of frauds. One is, where A is furnished by B with the funds to purchase land for him, and A promises to make the purchase, and then fraudulently purchases in his own name. The other is, where property is conveyed in trust for particular purposes, and no disposition made of the remainder. Then equity implies a resulting trust by implication after the objects of the trust are answered: See 2 Vol. of Fonblanque, 116, 117, 118, and Shepherd's Touchstone. In truth and fact, to give our statute of frauds a fair construction, there ought only to exist the latter kind of trust, as all other trusts are within the mischief of that statute. I have been informed that no counsel argued for Tobin; he would have attended himself, I have no doubt, had it not been for a belief that the court would not· decide causes argued or submitted last term. It is hoped that a rehearing will be granted.

*Answer to the Petition,* by PATRICK H. DARBY.

IN this cause the court was understood to subject the land to redemption, on the

VOL. VII. 4 D

BLIGHT'S hs &c
vs.
TOBIN &c.

Petition for rehearing.

Answer to the petition.

BLIGHT's hs &c vs. TOBIN &c.

Answer to the petition.

principle, that there are, and may be, cases of hardship, where the purchaser holds a *control* over the sale, and there is great *inadequacy of price*, and all other facts in the cause will be taken as evidence either of fraud, or such hardship as to warrant a redemption, by the payment of purchase money and interest. And that this is one of those cases. But these principles aside, Tobin was a purchaser with notice of the acts of the sheriff in not selling the personal property, and that that misconduct of the sheriff was produced by Tobin.

On principle, as well as on authority, the decision is maintainable on clear principles of law and equity, by the books and authorities cited by the court.

THE COURT overruled the petition, and the decision stands unaltered.

*Darby* for complainants; *Wickliffe and Mayes* for defendants.